Filed 3/16/16  In re Alex A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ALEX A., a Person Coming Under the Juvenile Court Law. | D068662 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>A. A.,<br><br>        Defendant and Appellant. | (Super. Ct. No. J518788) |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Tiffany Gilmartin for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

A. A. (the Father) appeals the termination of his parental rights to his son, Alex A. He contends the court erred in finding Alex was likely to be adopted and the beneficial

parent-child relationship did not apply. (See Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) The Father also maintains that the court erred in failing to grant a continuance to allow the completion of an Interstate Compact on Placement of Children (Fam. Code, § 7900 et seq.; ICPC) home study. In addition, the Father insists the juvenile court erred in not giving Alex's relatives preferential consideration for placement prior to placing Alex in a new foster home. We affirm.

### FACTUAL AND PROCECEDURAL BACKGROUND

On September 19, 2013, the San Diego County Health and Human Services Agency (Agency) filed a petition on behalf of one-month-old Alex. The petition alleged the Mother left the child inadequately supervised, suffered from mild mental retardation, and refused services to assist her in caring for the baby. Further, the Father was holding the child during an altercation with relatives. Finally, the parents lacked adequate housing and supplies for the infant and the infant was in need of the protection of the juvenile court.

Several incidents occurred prior to the Agency filing a petition. On September 6, the child abuse hotline received a referral alleging the Mother was a nonminor dependent, in extended foster care, who suffered from developmental delays. The Mother was required to live with a caregiver to assist her in caring for the newborn infant. However, the Mother left the home with Alex and did not provide any means of contacting her.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

Additionally, before she left, the Mother ran out of baby formula and had been feeding Alex water.

As part of extended foster care, the Mother had been working with a social worker, a parent partner, and a therapist. The service providers reported concern with respect to the Mother's capacity to understand Alex's needs and to provide for those needs without direct supervision. Further, there were concerns about the Father's mental health and possible physically abusive relationship with the Mother. The Father had a history of aggression and poor impulse control.

The investigating social worker interviewed the Mother on September 17, 2013, at the home of a paternal aunt. The Mother indicated she left the approved caregiver's home because the caregiver got on her nerves and the Father argued with the caregiver. During the argument, the Father grabbed the Mother's fingers, but did not injure her. The Mother had only minimal provisions for Alex's care at the time of her interview with the social worker. During the worker's conversation with the Mother, the paternal aunt, with whom the parents were living, walked by. The aunt appeared to be under the influence of alcohol or drugs because her speech was slurred, her eyes were glassy, and her hands were shaking. The social worker believed the aunt's home would not be a safe place for Alex to stay for many reasons, which included the fact that the aunt had a child protective services history.

The Mother had been dating the Father for about two years. She denied any domestic violence, but indicated the Father called her derogatory names. On the date the couple left the home of the approved caregiver, the Father became angry and picked up a

3

brick while holding Alex. The Mother planned to remain in a relationship with the Father and get an apartment with him.

The social worker interviewed the Father on September 18, 2013. The Father acknowledged becoming angry on September 7, 2013, and picking up a brick while holding Alex because he felt threatened. He later put the brick down.

The Father reported he had been abused as a child and explained this caused him to become very angry at times. He sometimes had flashbacks of the abuse. The Father denied drug use at the time of his interview, but indicated he had a drug history and completed a treatment program in 2011. He previously used marijuana, heroin, methamphetamine, and ecstasy.

At the detention hearing on September 20, 2013, the parents were present and the court appointed counsel to represent them. It found the Father to be Alex's presumed father. The court ordered an out-of-home detention and directed that the parents' visitation be supervised and separate.

The Agency held a team decision meeting (TDM) on September 26, 2013, to discuss issues and gather information about potential relatives to care for Alex. The Mother reported she wanted Alex to remain in foster care until she was ready to reunify with him. The Father did not attend the TDM and had not identified any relatives to evaluate for a possible placement for Alex. In addition, the Father tested positive for marijuana on September 18, 2013.

On November 7, 2013, the court sustained the Agency's petition, finding the allegations to be true by clear and convincing evidence. The Agency indicated it was in

4

the process of completing a relative home evaluation and requested a continuance, which the court granted.

On November 19, the court declared Alex a dependent, removed him from parental custody, and ordered reunification services be provided. It also ordered that Alex be placed in a licensed foster home.

The Agency's six-month review report dated May 14, 2014, recommended termination of reunification services and the setting of a section 366.26 hearing. Supporting the Agency's termination recommendation, the Mother's extended foster care services were terminated due to lack of compliance in February 2014. In April, the Mother reported being approximately four months pregnant with her second child with the Father. Additionally, the Father had not maintained consistent contact with the Agency.

The parents had separate supervised visits with Alex, offered on a weekly basis. However, the social worker opined it was not likely either parent would be able to reunify with Alex in the next six months. With regard to the Father, the social worker explained:

> "In regards to the father, the father has not made himself available to the Agency. The original concerns of domestic violence, substance abuse, and lack of parent education continue to present themselves as issues that need to be addressed because the father has not provided any information to the Agency and has not made himself available. The Agency has learned from the caregiver that the father had made consistent effort in contacting her regarding visits, but it is clear the father does not share the same interest in his reunification efforts despite the undersigned worker's attempts to ask the father to contact him consistently."

5

The Agency's addendum report dated July 18, 2014, confirmed the prior recommendation to terminate services for the Father, but asked that services to the Mother be extended for another six months. The Mother was making progress, but needed additional services to continue to address the protective issues.

At the six-month review hearing on July 18, 2014, the juvenile court found a return of Alex to parental custody would be detrimental and the services provided had been reasonable. It ordered another six months of reunification services for both parents and scheduled a 12-month review hearing. The court continued Alex's placement in licensed foster home care.

The Agency's 12-month status review report dated November 18, 2014, recommended a hearing be set to select and implement a permanent plan. The social worker noted the Mother gave birth to a baby girl, Izzy, on July 10, 2014. The Mother was participating in voluntary services for this child. The Mother indicated she had little contact with the Father, and he provided no financial support for Izzy. Similarly, the Father had been in minimal contact with the social worker with regard to Alex.

The Father did not attend the TDM on July 31, 2014, but he had been visiting Alex weekly at the family visitation center. The Father had been appropriate during visits by showing empathy "'some of the time'" and demonstrating a parental role. Nevertheless, the Father had not made any effort to engage in services designed to address the protective issues.

In August 2014, a physician at Rady Children's Hospital reported Alex had an obstruction in the right kidney. Alex underwent a medical procedure, spent the night in

the hospital, and was released the next day. During a developmental screening, delays were identified in Alex's communication, and he was referred to appropriate services.

At this time, Alex was strongly attached to his foster mother. He smiled a lot and appeared happy most of the time. Alex's foster mother indicated Alex was her ninth foster baby and described him as the easiest baby she had cared for. She had three biological children and was not able to adopt Alex.

Alex was scheduled to undergo surgery in November 2014 to correct the ureter's connection to the kidney. Alex wore an eye patch two hours a day due to exotropia of his right eye. He also was diagnosed with mastocytosis, a mast cell disease. The disorder caused cells to grow abnormally when exposed to an irritant. For Alex, the primary trigger was water. Therefore, he bathed only twice a week.

In January 2015, the Father indicated he wanted to attend outpatient substance abuse treatment so he could get the help he needed. The Father attended the orientation appointment, but did not follow through with the program. Similarly, the Father failed to follow up on the referrals for domestic violence treatment that the social worker gave him.

On January 2, 2015, Alex underwent a medical procedure to remove the stent implanted in his kidney during the November 5, 2014 surgery to remove an obstruction in his kidney and bladder. The stent caused Alex a lot of discomfort, and he appeared less fussy and much happier after it was removed. Alex was eating and sleeping well.

The Agency began to transition Alex to a new foster home in January 2015. On January 12, 2015, Alex was introduced to his current foster parents, Christopher and

Heather W. Christopher and Heather indicated they had experience handling medical issues similar to the ones Alex had, and they shared how they were dealing with those issues with another child in their care. Christopher and Heather reported they were interested in adopting Alex if he was placed with them.

After a series of visits, including overnight stays, Alex was moved to the new foster home on January 30, 2015. Heather told the social worker she and her husband wanted to adopt, explaining they loved Alex and he bonded with them immediately. While the transition to this home was in process, the Father contacted the social worker on January 28 to report his mother and sister were interested in placement. When asked why he did not mention their interest sooner, the Father replied that they had just moved and did not know they could take Alex. The Father also indicated he did not know if his mother and sister had ever met Alex.

Paternal aunt V.R. called the social worker and stated she was interested in placement to prevent Alex from being adopted. V.R. reported she lived in Texas and had met Alex when he was an infant. She added, " 'He's family and I would adopt if we had to.' " The paternal grandmother called and told the social worker she would support placement of Alex with V.R. The grandmother was moving to live near V.R. and also was interested in having Alex placed in her care. The social worker indicated he would be submitting ICPC home study requests on the out-of-state relatives.

The court held the contested 18-month permanency hearing on March 19, 2015. It found the services provided had been reasonable and a return of Alex to parental custody

8

would be detrimental. The court terminated court-mandated reunification services and scheduled a section 366.26 hearing.

During this period, Alex was attending preschool and the school had not reported any issues or concerns. Alex was not on medication or in therapy. He participated in in-home child enrichment services.

The Mother indicated she no longer wanted to visit Alex and wanted him adopted. The Father had been visiting Alex consistently. At the outset of the case, the Father appeared unable to understand how to console Alex when he was upset. However, the Father became more comfortable with Alex as the child became more mobile. After Alex was moved, the visitation request for the family visitation center was cancelled due to the Father's lack of transportation and inability to commute from Chula Vista to north San Diego County on a weekly basis.

On May 8, 2015, the Father had a two-hour visit at the Agency's Chula Vista office with Alex. The Father arrived first and was happy to see Alex when he entered the room. The Father tried to interact by showing the child photos on his cell phone and other actions, but Alex would not engage with him. Later Alex began playing with a toy train and the Father joined in the play. The Father indicated he was worried Alex would no longer remember him because they had not seen each other for three months. The Father was attentive and patient with Alex, and Alex allowed him to feed him some grapes. The visit ended without incident.

The Father visited Alex again on May 19, 2015. It took Alex a few minutes to warm up. The Father was patient, but continued to make efforts to engage Alex in a

gentle manner. He later read him a book and accompanied him playing with toys. The Father took a snack, which was packed by the caregiver, from the diaper bag and gave it to Alex. The Father was a little nervous at times and had to be instructed how to change Alex's diaper.

At a visit on June 9, 2015, the Father was able to change Alex's diaper without prompting or advice. At this visit, the Father's hand was completely swollen. The Father indicated he had fallen on some rocks the night before and that he had been out late. He admitted having a few drinks but reported he was not drunk because he was able to remember the entire evening.

The Father visited with Alex on July 2. The Father greeted Alex with a hug and offered him a snack from the diaper bag. The Father did not bring any snacks of his own to the visit. The Father played race cars with Alex and had to redirect the child a few times since he kept putting things in his mouth.

For the visit on July 28, 2015, the Father arrived 30 minutes late and brought along his 18-year-old sister, E.A. E.A. stated she had not seen Alex since he was two months old. The Father fed Alex a snack from the diaper bag. The Father and E.A. played blocks with Alex. The Father reported his sister in Texas completed her fingerprinting and background check for the home study, but the social services agency was waiting on the paternal grandmother to do her fingerprinting.

At this time, the grandmother was visiting San Diego and intended to go back to Texas in the near future. The Father reported he had gotten into a fight with the

10

grandmother because she was dating an old boyfriend that he did not approve of. The Father also stated the grandmother would not be visiting Alex while she was in town.

In a section 366.26 report, the social worker recommended adoption as the best permanent plan. The Father acknowledged he was not in a position to care for Alex. Meanwhile, the child's foster parents were committed to offering the child a permanent home through adoption. If, however, they were unable to adopt for any reason, the Agency had 37 approved adoptive families desirous of adopting a childlike Alex. The Father indicated he would like his sister to adopt Alex. The ICPC home study on the paternal aunt was submitted on June 2, 2015, and was in process. The aunt saw Alex one time before the dependency proceeding began but had not seen him for approximately two years. Thus, the child had no relationship with her.

The social worker opined it would not be detrimental to Alex to terminate parental rights. The Mother stopped visiting Alex and the Father's relationship was not so strong as to outweigh the benefits of adoption. The social worker further explained in pertinent part:

> "During the course of the visits that were supervised by this Social Worker, it was observed that the visits with the father are often pleasant. Alex acknowledges the prospective caregivers as his parents by referring to them as 'mama' and 'papa'. Alex does not acknowledge his birth parents as his parents. Alex has displayed no signs of emotional stress in separating from the father at the end of each visit. Alex enjoys playing with the father on his visits and it's clear to see that a relationship is starting to form. Alex does not have a significant bond with the father although the father is now visiting on a regular basis. Alex does not appear to have a father-son relationship with his father but a relationship that would be similar to one that a child would have with an extended family member whom he enjoy[ed] seeing and playing with."

11

The social worker noted Alex was in need of permanency and stability. She asked the juvenile court to terminate parental rights.

The matter came before the court for a section 366.26 hearing on July 15, 2015. The Father was present and the case was set for trial. The court continued the case on the contested hearing calendar.

The court held the contested section 366.26 hearing on August 12, 2015. The Father requested a continuance, which the court denied. It received into evidence the Agency's section 366.26 report dated July 15, 2015, an addendum report dated August 12, 2015, and the court-appointed special advocate report dated July 15, 2015. It took judicial notice of the prior findings and orders. After considering the evidence presented and hearing argument of counsel, the court found by clear and convincing evidence Alex was likely to be adopted and none of the statutory exceptions applied. It terminated parental rights and referred the child to the Agency for adoptive placement.

The Father timely appealed.

## DISCUSSION

## I

### *THE FATHER'S REQUEST FOR A CONTINUANCE*

#### A. The Father's Contention

The Father contends the court erred in failing to grant a continuance to allow the completion of the ICPC home study. We disagree.

12

## B. Background

On the day of the section 366.26 contested hearing, the Father's attorney made an oral motion for a continuance. She maintained that the Father intended to file a section 388 motion for relative placement for Alex, but could not do so because the Agency had not finished the ICPC home study for the Father's relatives in Texas. In response, the Agency's counsel did not object to the continuance, but represented to the court that the Agency had received a "verbal decision back from Texas and ICPC" the "home evaluation for the aunt ha[d] been denied based on her and people in the home not completing the [background] checks." The counsel noted that any continuance would not need to be long.

The court denied the request for a continuance, explaining:

> "Number one, relative placement, the preference is very weak at this point in time. [¶] Secondly, there's not going to be any change in placement from what I can tell. The Father's not prejudiced. He could have filed his 388 earlier. [¶] With regard to the I.C.P.C., we have very little control how quickly states do it. I mean, when we deal with Mexico with D.I.F., sometimes you can for wait a year on that. It depends on relatives coming forward timely, and I just don't believe there's good [cause for a] continuance. The preference to get finalization to these cases outweighs the Father's right to file an 11th hour 388 requesting for relative placement. [¶] If in fact the home was even approved, we're at a situation where if the child is in a stable home right now, the relative placement wouldn't necessarily overcome that. So based on that, I'm going to deny the request for continuance."

## C. Analysis

A continuance shall be granted only on a showing of good cause and shall not be granted if it is contrary to the minor's best interests. (§ 352, subd. (a).) In considering a

13

request for a continuance, the court must "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid*.) We reverse an order denying a continuance only on a showing of abuse of discretion. (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810-811.)

Here, we are satisfied the court did not abuse its discretion in finding that good cause did not exist for a continuance. The Father's attorney argued a continuance was necessary because the Father needed the results of the ICPC home study before he filed a section 388 motion. On appeal, the Father insists that the Agency is to blame for his delay because it did not timely process the ICPC. The record is unclear on this point.

When the court held the 18-month permanency review hearing on March 19, 2015, the Agency's counsel indicated the social worker did plan to pursue the ICPC home study on the relatives in Texas. The record does not disclose the reason for the delay and why the home evaluation was not submitted until June 2, 2015. It is unclear whether the social workers failed to perform their job duties, as suggested by the Father, or whether the relatives in Texas were undecided as to whether or not they wanted to be considered for adoptive placement. However, there is some indication in the record that the grandmother, who lived with the Father's aunt, had not completed her part of the home study requirements. And the Agency's counsel represented to the court that the home evaluation had been denied.

In addition, we agree with the court that the Father could have filed a section 388 motion earlier. In doing so, he could have explained that the ICPC home study had been

delayed and possibly could have gotten the process moved along more quickly or established a better record regarding who was to blame for the delay. Nevertheless, the Father did not do so, but instead waited until the day of the contested section 366.26 hearing to request a continuance so he could file his motion. The Father's efforts were too little and too late.

Finally, the court was correct in its conclusion that any preference for placement with the relatives was weak. At the time of the hearing, Alex's foster parents were willing to adopt him, and he had been living with them for over six months. In contrast, the relatives appeared reluctant to adopt as indicated by the statement they would adopt Alex if they had to.

For these reasons, we find no abuse of discretion on the record before us.

### 1. Failure to Place Alex With a Relative

In connection with his claim that the court erred by denying his request for a continuance, the Father also contends that the Agency's failure to timely complete the ICPC home study caused the juvenile court to err when it did not give preferential consideration of placing Alex with a relative in violation of section 361.3. We find no merit to this contention.

Section 361.3 gives "preferential consideration" to placement requests by certain relatives upon the child's removal from the parents' physical custody at the dispositional hearing.[2] (§ 361.3, subds. (a), (c); *In re Lauren R.* (2007) 148 Cal.App.4th 841, 854.)

---

[2] " 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).)

15

Before placing a child with a relative, the Agency must complete a child abuse central index check of the relative. (§§ 361.4, subd. (c), 309, subd. (d)(1); *In re S.W.* (2005) 131 Cal.App.4th 838, 846.)

On November 19, 2013, the juvenile court ordered Alex removed from his parent's custody. The Father does not point to anywhere in the record indicating that any of Alex's relatives were willing to take Alex at that time.

Instead, the Father emphasizes that the Agency transferred Alex from one set of foster parents (after a 15-month stay) to a new set of foster parents, but before Alex was placed in this new foster home, paternal aunt V.R. indicated a willingness for placement of Alex with her. The Father's argument discounts the timing of V.R.'s offer.

After a 15-month stay with foster parents who were unwilling to adopt Alex, the Agency introduced Alex to Christopher and Heather on January 12, 2015. At that time, Christopher and Heather indicated their intention to adopt Alex if he was placed with them. Alex moved in with Christopher and Heather on January 30, 2015.

Two days before Alex moved in with his new foster parents, V.R. contacted the social worker and indicated she was interested in placement of Alex to prevent him from being adopted. V.R. lived in Texas and wanted the placement there. She told the social worker she "would adopt if [she] had to." The next day, the paternal grandmother called the social worker and stated she would support placement with V.R. and that she would also seek placement of Alex as she was moving to Texas with or near V.R.

Here, there was no violation of section 361.3. V.R. only informed the social worker that she would take Alex two days prior to placement of Alex with his new foster

16

parents. Further, the Agency has already begun the process of moving Alex to his new foster parents more than two weeks before V.R. contacted the social worker. There was no time to complete a child abuse central index check in the two-day period between V.R. stating she was interested in taking Alex and placement of Alex with his new foster parents. The lack of time was not caused by any fault of the Agency, but instead, because V.R. and the paternal grandmother waited too long to offer a possible relative placement for Alex.

## II

### *ADOPTIBILITY*

#### A. The Father's Contention

Next, the Father maintains the court's finding that Alex is adoptable is not supported by substantial evidence. We disagree.

#### B. Analysis

"The issue of adoptability posed in a section 366.26 hearing focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) While psychological, behavioral, medical, and possible developmental problems may make it more difficult to find adoptive homes, they do not necessarily preclude an adoptability finding. (*In re Helen W*. (2007) 150 Cal.App.4th 71, 79; *In re Lukas B*. (2000) 79 Cal.App.4th 1145, 1154; *In re Jennilee T*. (1992) 3 Cal.App.4th 212, 224-225.) An adoptability finding requires "a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a

reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292; accord *In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) The possibility a child may have future problems does not mean the child is not likely to be adopted. (*In re Jennilee T.*, *supra*, at pp. 223-225.)

The likelihood of adoptability may be satisfied by a showing the minor is generally adoptable, that is, independent of whether the minor is in a prospective adoptive home (§ 366.26, subd. (c)(1)), or has a prospective adoptive parent " 'waiting in the wings.' " (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1313.)

We review a court's finding that a minor is adoptable for substantial evidence. (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Lukas B.*, *supra,* 79 Cal.App.4th at p. 1154.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or reweigh the evidence. Instead, we view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) Although the Agency bore the burden of proof on this issue at the section 366.26 hearing (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1557, 1559-1561), the Father has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947).

Here, the Father argues that Alex is not adoptable because he has serious medical problems. Further, he contends that Alex's current foster family has not had sufficient time to consider "the magnitude of adopting a child who has a complicated medical history, noted developmental delays, and on-going diseases that make simple tasks, such as hygiene, impossible." The Father's contentions, however, ignore the substantial evidence supporting the juvenile court's conclusion that Alex is generally adoptable as well as the fact that Alex's current foster parents are willing to adopt Alex now.

A child is generally adoptable when his or her personal characteristics are sufficiently appealing to make it likely that an adoptive family will be located in a reasonable time, regardless of whether a prospective adoptive family has been found. (See *In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) A child's relative youth, his or her good physical and emotional health, the minor's intellectual capacity and his or her ability to develop interpersonal relationships all indicate that the child is adoptable. (*In re Gregory A., supra,* 126 Cal.App.4th at p. 1562.)

The possibility that a child may have future problems does not preclude a finding that he or she is likely to be adopted. Even a minor exposed to substances in utero and suffering speech delays may be found generally adoptable. (*In re R.C.* (2008) 169 Cal.App.4th 486, 492.) Young children may be generally adoptable despite evidence of physical and developmental conditions, significant delays, and speech issues. These conditions require time to determine the full severity of the issues the minor will face. The certainty of a child's future medical condition is not required before a court can find

19

that the minor is generally adoptable. (See *In re Helen W*., *supra*, 150 Cal.App.4th at p. 79.)

Alex has health concerns. He had surgery to remove an obstruction in his kidney. He was diagnosed with extropia of the right eye in June 2014 and must wear an eye patch for two hours a day. Alex suffers from a mast cell disorder (mastocytosis) that causes mast cells to grow when he exposed to a primary irritant. For Alex, water is an irritant so he cannot be bathed regularly. Also, Alex has some "social-emotional" development issues.

Despite these concerns, the record contains substantial evidence of Alex's respective appealing characteristics. The social worker described Alex as "a joyful" child who "enjoys playing with his toys and looking at books." She noted he is "developmentally on target" and is "energetic, funny, and kind." The social worker further explained that Alex has a "healthy curiosity" and is "affectionate and playful with those he is familiar with."

Additionally, Alex was in a prospective adoptive home at the time of the section 366.26 hearing, and the caregivers were committed to adoption. If the current caregivers are not able to adopt Alex, there are 37 approved adoptive homes for Alex in San Diego county.

Accordingly, construing the record in the light most favorable to the order, we conclude substantial evidence supports the adoptability finding. (*In re Josue G., supra,* 106 Cal.App.4th at p. 732; *In re J.I.* (2003) 108 Cal.App.4th 903, 911.)

## III

### *THE BENEFICIAL PARENT-CHILD EXCEPTION*

#### A. The Father's Contentions

Finally, the Father argues substantial evidence did not support the court's finding that the beneficial relationship exception did not apply to the Father's relationship with Alex.

#### B. Analysis

Section 366.26, subdivision (c)(1) allows termination of parental rights upon clear and convincing evidence of adoptability. An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id*. at p. 576.) The Father has the burden to prove the facts supporting applicability of this exception to adoption. (*In re Scott B*. (2010) 188 Cal.App.4th 452, 469.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would

be detrimental to the child. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) Here, examining the evidence in the light most favorable to the order, we conclude that the Father failed to meet his burden of showing a beneficial relationship. (*In re Autumn H.*, *supra*, at p. 576.)

If the court determines a child is adoptable (as Alex is), the parent bears the burden of showing that the termination of parental rights would be detrimental under one of the exceptions listed in section 366.26 subdivision (c)(1). (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) The Father asserts he meets the first prong of the parental benefit exception because he maintained regular visitation and contact with Alex within the meaning of section 366.26 subdivision (c)(1)(B)(i). The Agency admits that the social worker characterized the Father's visits as consistent prior to the section 366.26 hearing in August 2015. However, the Agency notes that during the spring of 2015, the Father's contact with Alex had not been regular as he went three months without visiting him. Yet, we need not resolve this apparent dispute because we agree with the superior court that the Father has not established that he had a parent-child relationship with Alex.

The issue here is not whether there was a bond between the Father and Alex. The question is whether that relationship remained so significant and compelling in Alex's life that the benefit of preserving it outweighed the stability and benefits of adoption. The " 'benefit' " necessary to trigger this exception requires that " 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement

22

against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 528–529, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 575.) As described in *Autumn H.*, the beneficial relationship must be examined on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Id.* at pp. 575–576; *In re J.C.*, *supra*, at p. 532.)

The Father argues that he has demonstrated a parental relationship with Alex. To this end, he points out that, during visits, he brought Alex snacks and learned to respond to Alex's cues. Additionally, Alex hugged him at the end of visits. We agree that the Father has made progress in becoming more comfortable with Alex, and in turn, Alex has become more comfortable with the Father. That said, sufficient evidence supports the court's finding that the Father's relationship with Alex does not promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

For example, the social worker noted that Alex calls his caregivers "mama" and "papa" and does not acknowledge the Father as a parent. Alex displays no signs of emotional distress in separating from the Father at the end of each visit. Although Alex enjoys playing with the Father and a relationship is starting to form, there is nothing in the record that supports the conclusion that Alex has a significant bond with the Father.

23

As the social worker observed, "Alex does not appear to have a father-son relationship with his father but a relationship that would be similar to one that a child would have with an extended family member." Further, the Father indicated that he cannot care for Alex. And the Agency documented its concern that "issues of domestic violence and drugs and alcohol abuse would continue to exist in the father's livelihood, and Alex would be at a risk of serious emotional trauma, illness, physical injury, or even death should he be exposed to them." The Agency also noted its "ongoing concerns regarding the [Father's] lack of parenting skills, the lack of ability to put Alex's needs before [his] own, and the ability to provide a safe and stable environment for Alex."

In conclusion, we agree with the juvenile court that the Father did not carry his burden in proving the beneficial parent-child exception applied.

DISPOSITION

The order is confirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.

24